John Heenan
Joseph Cook
john@lawmontana.com
joe@lawmontana.com
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, MT 59102
Phone: (406) 839-9091

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| CAROLINE ANDERSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SNOWFLAKE INC., and TICKETMASTER, L.L.C.,<br><br>Defendants. | Case No.: CV-24-105-BU-BMM<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Caroline Anderson ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to herself, and on information and belief as to all other matters, by and through undersigned counsel, brings this Class Action Complaint against Defendants Snowflake, Inc., ("Snowflake") and Ticketmaster, L.L.C. ("Ticketmaster") (collectively,

1

"Defendants").

## <u>NATURE OF THE ACTION</u>

1.    Plaintiff brings this class action on behalf of herself and all other individuals ("Class Members") who had their sensitive personally identifiable information[1] ("Personal Information" or "PII") disclosed to unauthorized third parties during a data breach compromising Snowflake's systems and divulging sensitive Personal Information of the customers and other affiliates of Snowflake's, such as Ticketmaster (the "Data Breach").

2.    Snowflake provides cloud-based data storage and analytics services to its customers, enabling businesses to manage, share, and analyze large amounts of data. In doing so, Snowflake promises its customers that it will protect the data they store, claiming that it "sets the standard for data security."[2]

3.    Despite Snowflake's representations about the security of its systems, it failed to protect the data of an estimated 165 of its organizational clients,[3] including Ticketmaster, leading to the exposure of the Personal Information of many

---

[1] Personally identifiable information is any information that is or could be used, whether on its own or in combination with other information, to identify, locate, or contact a person, including without limitation names, email addresses, phone numbers, home addresses, dates of birth, Social Security numbers ("SSN"), drivers' license information, and other government issued identification numbers.

[2] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security (last accessed Sept. 16, 2024).

[3] *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, MANDIANT, June 10, 2024, https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last accessed Sept. 16, 2024).

millions of individuals.[4]

4.      On or about May 23, 2024, Snowflake discovered that unauthorized third parties gained access to numerous of its customers' cloud storage accounts. Because Snowflake is the cloud storage and data warehousing vendor for many large companies, the Personal Information of the affected companies' customers, employees, and/or clients was exposed.

5.      Ticketmaster is a global ticketing and booking service provider for the entertainment and arts industries. On information and belief, Ticketmaster is a customer of Snowflake and utilizes Snowflake to host large amounts of data, including Personal Information of its employees and/or customers. On or around May 20, 2024, Ticketmaster's parent company Live Nation Entertainment Inc. confirmed that Ticketmaster was one of the customers affected by Snowflake's Data Breach, and that the Personal Information of a currently undetermined number of its customers was breached.[5]

6.      The Personal Information that was exposed in the Data Breach, as it relates to Ticketmaster, has currently not been disclosed. Ticketmaster has, at this time, only stated that the breach involved "user data."[6] However, according to

---

[4] *Overview of the Snowflake Breach: Threat Actor Offers Data of Cloud Company's Customers*, SOCRADAR, June 2, 2024, https://socradar.io/overview-of-the-snowflake-breach/ (last accessed Sept. 16, 2024).
[5] Form 8K, Live Nation Entertainment, Inc., May 31, 2024, https://www.sec.gov/Archives/edgar/data/1335258/000133525824000081/lyv-20240520.htm?=7194ef805fa2d04b0f7e8c9521f97343 (last accessed Sept. 16, 2024).
[6] *Id.*

individuals purporting to sell the data online, it includes PII, ticket sales, and customer card information.[7]

7.    Other affected customers of Snowflake, who also had data exposed during the Data Breach, include industry giants such as LendingTree, Advance Auto Parts, Santander, AT&T, and Neiman Marcus.

8.    Due to Snowflake's failure to implement and maintain adequate security procedures, and Ticketmaster's failure to adequately vet its vendors, Plaintiff's and Class members' Personal Information is now in the hands of cybercriminals.

9.    At this stage, neither Defendant has offered sufficient assurances that all exposed Personal Information or data has been recovered or destroyed, or that Defendants have taken appropriate efforts to ensure that the Personal Information of Defendants and their customers will not be further exposed by a subsequent data breach.

10.    Plaintiff and Class Members would not have provided their valuable Personal Information had they known that Defendants would fail to take the appropriate steps to safeguard their Personal Information.

11.    Plaintiff and Class Members now face a substantially increased risk of

_____

[7] Zach Whittaker, *Live Nation confirms Ticketmaster was hacked, says personal information stolen in data breach*, TECHCRUNCH, May 31, 2024, https://techcrunch.com/2024/05/31/live-nation-confirms-ticketmaster-was-hacked-says-personal-information-stolen-in-data-breach/ (last accessed Sept. 16, 2024).

identity theft and fraud. Accordingly, these individuals now must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

## PARTIES

12.    Plaintiff Caroline Anderson is and at all relevant times was a resident and citizen of the state of New Hampshire. Plaintiff is a former customer of Ticketmaster and/or otherwise transacted with Ticketmaster.

13.    Plaintiff provided Personal Information to one of Snowflake's customers, Ticketmaster, in connection with making purchases from Ticketmaster.

14.    Plaintiff received an email from Ticketmaster notifying her of a data breach at Snowflake which had affected her Personal Information. According to the email, the personal information disclosed may have included her name, contact information, and payment information.

15.    Once Personal Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff will need to continue to monitor her credit for fraudulent activity for years, and possibly her entire life.

16.    Plaintiff also suffered actual injury from having Personal Information compromised as a result of the Data Breach, including, but not limited to damage to and diminution in the value of Plaintiff's confidential personal information, which was compromised as a result of the Data Breach.

17.    As a result of Defendants' failure to adequately safeguard Plaintiff's

information, Plaintiff has been injured. Plaintiff is also at a continued risk of harm because her information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate data security measures to protect the Personal Information in their possession.

18.     Defendant Snowflake Inc. is a company incorporated under the laws of the State of Delaware, with its principal place of business at 106 E. Babcock Street, Suite 3A, Bozeman, Montana 59715.

19.     Snowflake is a computing company that provides data storage, processing, and analytics solutions to its customers, like Ticketmaster. As part of their data hosting and/or storage services, Snowflake keeps large amounts of Personal Information provided by its customers.

20.     Defendant Ticketmaster is a company incorporated under the laws of the State of Virginia, with its principal place of business located at 9348 Civic Center Drive, Beverly Hills, CA 90210.

21.     Ticketmaster sells tickets for venues like stadiums, museums, and performing arts centers, and also operates resale platforms for fans to resell tickets. Ticketmaster collects the Personal Information of its customers and employees during its regular course of business.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to

the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a) and (d), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000.00) and is a class action in which Plaintiff is a citizen of states different from Defendants.

23.    This Court has personal jurisdiction over Snowflake because Snowflake's principal place of business is located in Montana.

24.    This Court has personal jurisdiction over Ticketmaster because Ticketmaster conducts significant business in the state of Montana, and the acts and omissions giving rise to Plaintiff's claims occurred in this district.

25.    Venue properly lies in this judicial district because it is the district in which Defendants have the most significant contacts, and a substantial part of the conduct giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

### A. Defendants Represented They Could Properly Safeguard Sensitive Data

26.    Ticketmaster collects Personal Information from its customers and employees in the regular course of its business. Ticketmaster tells its customers "[w]e have security measures in place to protect your information."[8] It additionally states, "[w]e're always taking steps to make sure your information is protected and deleted securely when we no longer need it."[9]

---

[8] *Privacy Policy*, TICKETMASTER, https://privacy.ticketmaster.com/privacy-policy#privacy-notice (last accessed Sept. 16, 2024).
[9] *Id.*

27.    Ticketmaster is a customer of Snowflake and utilizes Snowflake's data hosting/storage services to store, among other things, customer and employee Personal Information.

28.    Snowflake is a cloud-based data storage and analytics services company, hosting large amounts of data, generally for other businesses and companies, like Ticketmaster.

29.    Snowflake touts itself as a leader in data security, stating that "Snowflake was built to deliver end-to-end data security for all users."[10]

30.    Snowflake contends that it "follows world-class, standards-based practices for the controls and processes that secure it and is based on a multilayered security architecture to protect customer data and access to that data. This security architecture is complemented by the monitoring, alerts, controls, and processes that are part of Snowflake's comprehensive security framework."[11]

31.    Snowflake also informs customers and potential customers that "[a]ll aspects of Snowflake's architecture, implementation, and operation are designed to protect customer data in transit and at rest against both current and evolving security threats."[12]

32.    In its capacity as a data hosting and storage company, Snowflake is

---

[10] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security (last accessed Sept. 16, 2024).

[11] *Id.*

[12] *Id.*

provided and entrusted with data, such as Personal Information, for millions of individuals, including Plaintiff and Class Members.

33.    Snowflake knows the importance of data security and utilizes the fear of data breaches to promote its products. It states on its website, "[i]n today's connected world where cybercriminals have greater opportunity than ever before, data security is crucial for every business."[13]

34.    Snowflake goes on to state, on its website:

"Data breaches cause customers to lose trust in a business, and they can significantly damage a company's reputation if news of the breach gets out to the media. Additionally, lawsuits, settlements, and fines related to data breaches are also increasing. [...]. And if an organization's intellectual property is compromised, its ability to compete may be permanently affected. For these reasons, data security should be a priority for every business in every industry, not just highly regulated industries such as healthcare and finance."[14]

35.    Despite promoting itself as a solution to the problem of data security, however, Snowflake's own lack of adequate security procedures led to the Data Breach and compromise of Plaintiff's and Class Members' Personal Information.

**B.    The Data Breach**

36.    In April 2024, cybersecurity firm Mandiant received information regarding a threat on database records of a Snowflake customer. The customer engaged Mandiant, who "determined that the organization's Snowflake instance had been compromised by a threat actor using credentials previously stolen via

---

[13] *Id.*
[14] *Id.*

infostealer malware. The threat actor used these stolen credentials to access the customer's Snowflake instance and ultimately exfiltrate valuable data."[15]

37.    On May 22, 2024, after obtaining additional information identifying a larger campaign to target Snowflake customers, Mandiant contacted Snowflake and began notifying Snowflakes customers who it determined may have been affected by the threat actors' actions.[16]

38.    Snowflake itself noticed unusual activity in its systems around mid-April 2024, and officially acknowledged unauthorized access on May 23, 2024.[17]

39.    Ticketmaster was one of the Snowflake customers whose data was exposed during the Data Breach. Following Snowflake's notification of the Data Breach, Ticketmaster began notifying its own customers of the Data Breach, via notification letters. The letters indicate that Ticketmaster learned that an unauthorized third party gained access to certain information maintained by Ticketmaster within Snowflake, its cloud storage and data warehousing vendor.

40.    During the larger investigation into the Snowflake Data Breach, cyber security company Mandiant identified numerous successful compromises to various Snowflake accounts due to three primary issues:

---

[15] UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion, MANDIANT. https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last accessed Sept. 16, 2024).
[16] *Id.*
[17] *Overview of the Snowflake Data Breach: Threat Actor Offers Data of Cloud Company's Customers*, SOCRADAR, June 2, 2024, https://socradar.io/overview-of-the-snowflake-breach/ (last accessed Sept. 16, 2024).

"1. The impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password.
2. Credentials identified in infostealer malware output were still valid, in some cases years after they were stolen, and had not been rotated or updated.
3. The impacted Snowflake customer instances did not have network allow lists in place to only allow access from trusted locations."[18]

41.    Mandiant's investigation concluded that the threat actor's "campaign against Snowflake customer instances is not the result of any particularly novel or sophisticated tool, technique, or procedure."[19]

42.    Mandiant went on to state that "[t]he broad impact of this campaign underscores the urgent need for credential monitoring, the universal enforcement of MFA and secure authentication, limiting traffic to trusted locations for crown jewels, and alerting on abnormal access attempts."[20]

43.    On June 2, 2024, Snowflake released a statement on its website regarding its own findings surrounding the Data Breach. Snowflake stated that the Data Breach "appears to be a targeted campaign directed at users with single-factor authentication." Snowflake recommended that organizations enforce multi-factor authentication on all accounts, and stated they were working to make multi-factor authentication mandatory.[21]

---

[18] *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*. MANDIANT, June 10, 2024, https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last accessed Sept. 16, 2024).
[19] *Id.*
[20] *Id.*
[21] *Detecting and Preventing Unauthorized User Access*, SNOWFLAKE, June 10, 2024, https://snowflake.discourse.group/t/detecting-and-preventing-unauthorized-

44.     On July 9, 2024, Snowflake announced a new feature wherein administrators could make multi-factor authentication mandatory.[22]

45.     Following the threat actor's exfiltration of data from Snowflake customer accounts, cybercriminals have publicly claimed to be selling stolen data.[23]

46.     The hacker group ShinyHunters, for instance, has claimed to be selling 560 million records from Ticketmaster.[24]

47.     Mandiant and Snowflake have confirmed that threat actors stole information from approximately 165 Snowflake customers.[25] While the stolen data varies, it includes a wide variety of Personal Information, including but not limited to: names, addresses, email addresses, dates of birth, credit card information, bank account information, Social Security Numbers, driver's license numbers, and other government identification numbers.

48.     The Data Breach has compromised the Personal Information of millions of individuals, and the full extent of the Data Breach is not currently known.

---

user-access/8967 (last accessed Sept. 16, 2024).

[22] Brad Jones and Anoosh Saboori, *Snowflake Admins Can Now Enforce Mandatory MFA*, Blog, RESOURCES, July 9, 2024, https://www.snowflake.com/en/blog/snowflake-admins-enforce-mandatory-mfa/ (last accessed Sept. 16, 2024).

[23] Burges, Matt, *The Snowflake Attack May Be Turning Into One of the Largest Data Breaches Ever*, WIRED, June 6, 2024, https://www.wired.com/story/snowflake-breach-advanced-auto-parts-lendingtree/ (last accessed Sept. 16, 2024).

[24] *Id.*

[25] *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, MANDIANT, June 10, 2024, https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last accessed Sept. 16, 2024).

**C.    Personal Information is Inherently Valuable, and a Data Breach was Foreseeable**

49.    It is well known that Personal Information, including Social Security Numbers, is an invaluable commodity and a frequent target of hackers. Data breaches against companies that store Personal Information in their systems have become widespread.

50.    In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[26]

51.    Additionally, as companies became more dependent on computer systems to run their businesses, *e.g.* working remotely as a result of the Covid-19 pandemic, and the Internet of Things, the danger posed by cyber criminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[27]

52.    Indeed, cyberattacks have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further

---

[26] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/.
[27] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last accessed Sept. 16, 2024)

warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[28]

53.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

54.    In light of these warnings, and the recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Personal Information that they collected and maintained would be targeted by cybercriminals.

55.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of Personal Information preceding the date of the breach.

---

[28] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

56.     This is especially true because Personal Information is a valuable property right.[29] The value of Personal Information as a commodity is measurable.[30] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[31] American companies are estimated to have spent over \$19 billion on acquiring personal data of consumers in 2018.[32] It is so valuable to identity thieves that once Personal Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

57.     As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various

---

[29] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION AND COMMUNICATION TECHNOLOGY, May 2015, https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...") (last accessed Sept. 16, 2024).

[30] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for \$50 Each on Black Market*, MEDSCAPE, Apr. 28, 2014, http://www.medscape.com/viewarticle/824192 (last accessed Sept. 16, 2024).

[31] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, p.4, OECD Publishing, Apr. 2, 2013, https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en (last accessed Sept. 16, 2024)

[32] *U.S. Firms to Spend Nearly \$19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU, Dec. 5, 2018, https://www.iab.com/news/2018-state-of-data-report/ (last accessed Sept. 16, 2024).

breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

58.    The Personal Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.

59.    For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[33] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[34] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[35]

60.    Consumers place a high value on the privacy of Personal Information. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[36]

---

[33] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Sept. 16, 2024)
[34] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Sept. 16, 2024).
[35] *In the Dark*, VPNOverview.com, accessible at https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Sept. 16, 2024).
[36] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22 INFORMATION SYSTEMS RESEARCH 254,

61.    Further, an active and robust legitimate marketplace for Personal Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[37]

62.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[38]

63.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[39]

64.    As a result of the Data Breach, Plaintiff's and Class Members' Personal Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Personal Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

65.    Given these facts, any company that transacts business with a consumer

---

June 2011, https://www.jstor.org/stable/23015560?seq=1

[37] See Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, INFOSEC, July 27, 2015,
https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[38] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak,* L.A. TIMES, Nov. 5, 2019, https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed Sept. 16, 2024).

[39] https://digi.me/what-is-digime/

and then compromises the privacy of consumers' Personal Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### D. Snowflake Failed to Comply with FTC Guidelines and Industry Standards.

66.    Defendants were prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

67.    The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

68.    According to the FTC, the need for data security should be factored into all business decision-making.

69.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

70.    The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

71.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

72.    The FTC further recommends that companies not maintain Personal Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

73.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect private data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

74.    Defendants failed to properly implement basic data security practices.

75.    Defendants' failures to employ reasonable and appropriate measures to protect against unauthorized access to Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

76.    Defendants were at all times fully aware of their obligation to protect the Private Information they obtained, stored and/or hosted. Defendants were also aware of the significant repercussions that would result from their failure to do so.

77.    Several best practices have been identified that at a minimum should be implemented by companies hosting or storing Personal Information, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

78.    Other best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

79.    Snowflake failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without

limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

80. These foregoing frameworks are existing and applicable industry standards, and Snowflake failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

### E. Defendants Owed Plaintiff and Class Members a Duty to Safeguard Their Personal Information

81. In addition to their obligations under federal and state laws, both Snowflake and Ticketmaster owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

82. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of class members.

83. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private

Information in their possession, including adequately training its customers and others who used its systems on how to use those systems to adequately protect Private Information.

84.     Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

85.     Ticketmaster owed a duty to Plaintiff and Class Members to properly vet all third parties to whom they provided the Personal Information of their employees and/or customers.

86.     Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

87.     Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**F. Defendants Have Caused Harm to Plaintiff and Class Members.**

88.     The effects of Defendants' failure to safeguard Plaintiff's and Class Members' Personal Information are drastic.

89.     Victims of a data breach are much more likely to become victims of identity theft and other types of fraud.

90.     Theft of Personal Information is serious. The Federal Trade Commission ("FTC") warns consumers that identity thieves use Personal Information to exhaust financial accounts, receive medical treatment, start new

utility accounts, and incur charges and credit in a person's name.[40]

91.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[41] According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.[42]

92.    With access to an individual's Personal Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the

---

[40] *See What to Know About Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER ADVICE, https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Sept. 16, 2024).

[41] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[42] Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN, Sept. 1, 2017, https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

victim's name but with the thief's picture, using the victim's name and SSN to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[43]

93.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.  For example, with the Private Information stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.   These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

94.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know

---

[43] *See Warning Signs of Identity Theft*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Sept. 16, 2024).

that her or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

95.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[44]

96.    It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their Personal Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

97.    Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[45]

98.    Snowflake, as one of the largest data cloud service providers in the

---

[44] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf (last accessed Sept. 16, 2024).

[45] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION, Sept. 2013, http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf (last accessed Sept. 16, 2024).

world, was aware of the need for adequate data security measures. Ticketmaster, as a company who collects and stores the Personal Information of its employees and customers, was also aware of the need for adequate security measures.

99.    As a result of the Data Breach, Plaintiff and millions of individuals have had their information exposed. Millions of Ticketmaster employees and customers were affected. Numerous other Snowflake customers have reported being impacted by the Data Breach, and potentially millions of additional persons have had their sensitive Personal Information exposed as a result of Snowflake's product being exploited by criminals during the Data Breach.

100.   The harm caused to Plaintiff and Class Members by the Data Breach is already apparent. The Data Breach creates a heightened security concern for Plaintiff and Class Members because SSNs, dates of birth, and other sensitive information was among the data exposed during the Data Breach.

101.   Theft of SSNs creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of her SSN, and a new SSN will not be provided until after the harm has already been suffered by the victim.

102.   Given the highly sensitive nature of SSNs, theft of SSNs in combination with other personally identifying information (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. Per the United States Attorney

General, Social Security numbers "can be an identity thief's most valuable piece of consumer information."[46]

103.    Defendants had a duty to keep sensitive information confidential and to protect it from unauthorized disclosures. Plaintiff and Class Members provided their Personal Information to Snowflake customers, including Ticketmaster, with the common sense understanding that any third parties who obtained said data would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

104.    Defendants' data security obligations were particularly important given the substantial increase in data breaches—particularly those involving SSNs—in recent years, which are widely known to the public and especially to anyone in Snowflake's industry of data collection and transfer.

105.    Data breaches are by no means new, and they should not be unexpected. These types of attacks should be anticipated by companies that store sensitive and personally identifying information, and these companies must ensure that data privacy and security is adequate to protect against and prevent known attacks.

---

[46] *Fact Sheet: The Work of the President's Identity Theft Task Force*, DEP'T OF JUSTICE, Sept. 19, 2006, https://www.justice.gov/archive/opa/pr/2006/September/06_ag_636.html (last accessed Sept. 16, 2024).

106.    It is well known among companies that store sensitive personally identifying information that sensitive information—like the SSNs and other Personal Information stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers. . . . Many of them were caused by flaws in . . . systems either online or in stores."[47]

107.    Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

108.    There may also be a time lag between when sensitive Personal Information is stolen and when it is used. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, *stolen data may be held for up to a year or more before being used to commit identity theft*. Further, once stolen data have been sold or posted on the Web, *fraudulent use of that information may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[48]

109.    Sensitive Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the

---

[47] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUSINESS INSIDER, Nov. 19, 2019, 8:05 A.M., https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1 (last accessed Sept. 16, 2024).
[48] *Id*. at 29 (emphasis added).

information on the dark web and the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen SSNs and other sensitive Personal Information directly on various illegal websites making the information publicly available, often for a price.

110.   Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other notable (similar) data breaches, Defendants failed to take reasonable steps to adequately protect their systems from being breached, leaving its customers and all persons who provide sensitive Personal Information to those customers (i.e., Plaintiff and the Class Members) exposed to risk of fraud and identity theft.

111.   Defendants are, and at all relevant times have been, aware that the sensitive Personal Information they handle and store is highly sensitive. As a company that provides data storage services involving highly sensitive and identifying information, Snowflake is especially aware of the importance of safeguarding that information and protecting its systems and products from security vulnerabilities.

112.   Defendants were aware, or should have been aware, of regulatory and industry guidance regarding data security, and were alerted to the risk associated with failing to ensure that its product was adequately secured.

113.   Despite the well-known risks of hackers, cybercriminals, data breaches, and cybersecurity intrusions, Defendants failed to employ adequate data security measures in order prevent breaches, including the Data Breach.

114.   The security flaws inherent to Snowflake's product run afoul of industry best practices and standards. Had Snowflake used adequate security measures, such as making multi-factor authentication mandatory, it could have prevented the Data Breach. Ticketmaster had an obligation to vet its third-party data hosting vendors, and a responsibility to ensure that their practices meet basic industry standards.

115.   Despite that Snowflake was on notice of the very real possibility of data theft associated with its platform, it failed to make necessary changes to the product and permitted a massive intrusion to occur that resulted in the platform's disclosure of Plaintiff's and Class Members' Personal Information to criminals.

116.   Defendants permitted Plaintiff's and Class Members' Personal Information to be compromised and disclosed to criminals by failing to take reasonable steps against an obvious threat.

117.   Industry experts are clear that a data breach is indicative of data security failures. Indeed, industry-leading research and advisory firm Aite Group has identified that: "If your data was stolen through a data breach that means you were somewhere out of compliance" with payment industry data security standards.[49]

118.    As a result of the Data Breach, Plaintiff's and Class Members' Personal Information is now in the hands of criminals, they face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action

---

[49] Lisa Baertlein, *Chipotle Says Hackers Hit Most Restaurants in Data Breach*, REUTERS, May 26, 2017, http://www.reuters.com/article/us-chipotle-cyber-idUSKBN18M2BY (last accessed Sept. 16, 2024).

to protect themselves from such identity theft and fraud.

119.    As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.  Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

120.    Plaintiff and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

- Trespass, damage to, and theft of their personal property, including Private Information;

- Improper disclosure of their Personal Information;

- The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Personal Information being in the hands of criminals and having already been misused;

- Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

- Ascertainable losses in the form of deprivation of the value of Personal Information, for which there is a well-established and quantifiable national and international market;

- The loss of use of and access to their credit, accounts, and/or funds;

- Damage to their credit due to fraudulent use of their Personal Information; and

- Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

121.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Personal Information, which remains in the possession of Defendants, is protected from further public disclosure by the implementation of better vendor vetting, and industry standard and statutorily compliant security measures and safeguards. Defendants have shown themselves to be wholly incapable of protecting Plaintiff's and Class Members' Personal Information.

## CLASS ALLEGATIONS

122.    Plaintiff brings this action on her own behalf, and on behalf of the following Classes:

### Nationwide Class

All individuals in the United States whose Personal Information was compromised in the Snowflake Data Breach that occurred in or around April and May of 2024.

**California Class**
All individuals in the state of California whose Personal Information was compromised in the Snowflake Data Breach that occurred in or around April and May of 2024.

123.    Excluded from the Class are: (i) Snowflake's officers, directors, legal representatives, successors, subsidiaries, and assigns; (ii) Ticketmaster's officers, directors, legal representatives, successors, subsidiaries, and assigns; and (iii) any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

124.    **Numerosity**: While the precise number of Class Members has not yet been determined, members of the Class are so numerous that their individual joinder is impracticable, as the proposed Class appears to include many millions of members who are geographically dispersed.

125.    **Typicality**: Plaintiff and all Class Members were injured through Defendants' uniform misconduct and assert similar claims against Defendants. Accordingly, Plaintiff's claims are typical of Class Members' claims.

126.    **Adequacy**: Plaintiff's interests are aligned with the Class she seeks to represent and she has retained counsel with significant experience prosecuting complex class action cases, including cases involving privacy and data security violations. Plaintiff and counsel intend to prosecute this action vigorously. The

Class's interests are well-represented by Plaintiff and undersigned counsel.

127.   **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and Class Member's claims. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class Members individually to effectively redress Snowflake's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

128.   **Commonality and Predominance:** The following questions common to all Class Members predominate over any potential questions affecting individual Class Members:

- whether Defendants engaged in the wrongful conduct alleged herein;

- whether Defendants had a duty to implement and maintain reasonable data security practices to protect and secure Plaintiff's and Class Members' Personal Information from unauthorized access;

- whether Defendants' security practices were adequate under the FTC Act and industry standards;

- whether Defendants were negligent or negligent per se;

- whether Defendants' data security practices resulted in the unauthorized disclosure of Plaintiff's and other Class Members' Personal Information;

- whether an implied contract existed between Plaintiff and Class Members on one hand and Defendants on the other, with respect to protecting Personal Information, and whether that contract was breached;

- whether Defendants were unjustly enriched by their conduct as alleged herein; and

- whether Plaintiff and Class Members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

129.    Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

## <u>FIRST CAUSE OF ACTION</u>
### NEGLIGENCE
**(On Behalf of Plaintiff and the Classes against Snowflake)**

130.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

131.    Snowflake owed a duty of care to Plaintiff and Class Members to exercise reasonable care in obtaining, hosting, securing, safeguarding, and/or protecting their Personal Information.

132.    Snowflake was entrusted with, stored, and otherwise had access to the Personal Information of Plaintiff and Class Members.

133.    Snowflake knew, or should have known, of the risks inherent to storing the Personal Information of Plaintiff and Class Members, and to not ensuring that its data hosting product was secure. These risks were reasonably foreseeable to Snowflake.

134.    Snowflake owed duties of care to Plaintiff and Class Members whose Personal Information had been entrusted to Snowflake.

135.    Snowflake breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate data security. Snowflake had a duty to safeguard Plaintiff's and Class Members' Personal Information and to ensure that its systems and products adequately protected Personal Information. Snowflake breached its duty.

136.    Snowflake was in a position to ensure that its systems and products were sufficient to protect against breaches and the harms that Plaintiff and Class Members have now suffered.

137.    A "special relationship" exists between Snowflake, on the one hand, and Plaintiff and Class Members, on the other hand. Snowflake entered into a "special relationship" with Plaintiff and Class Members by agreeing to accept, store, and have access to sensitive Personal Information provided by Plaintiff and Class Members to

Snowflake's clients.

138.   Snowflake knew or should have known that its failure to implement reasonable data security measures to protect and safeguard Plaintiff's and Class Members' Personal Information would cause damage to Plaintiff and the Class.

139.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Snowflake's inadequate security practices.

140.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Snowflake knew or should have known of the inherent risks in collecting and storing Personal Information, the critical importance of providing adequate security of that Personal Information, and the necessity for encrypting Personal Information stored on its systems.

141.   Plaintiff and the Class had no ability to protect their Personal Information that was in, and possibly remains in, Snowflake's possession.

142.   But for Snowflake's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

143.   Snowflake acted with wanton disregard for the security of Plaintiff's and Class Members' Personal Information.

144.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Snowflake's breach of its duties. Snowflake knew or should have known that it was failing to meet its duties, and that Snowflake's breach

would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

145.   Plaintiff and Class Members suffered more than just economic harm as a result of the Data Breach. Plaintiff and Class Members suffered loss of time, loss of value of their Personal Information, and loss of privacy concerning their Personal Information.

146.   As a direct and proximate result of Snowflake's negligent conduct, Plaintiff and Class Members now face a certain increased risk of future harm. For them, the purpose for criminals to steal Personal Information is to sell it on the dark web for a profit to other criminals who purchase the information and use it to make fraudulent transactions or to support ransomware.

147.    As a direct and proximate result of Snowflake's negligence, Plaintiff and Class members have suffered injuries including:

- Trespass, damage to, and theft of their personal property, including Private Information;

- Invasion of privacy

- Misuse of their compromised Personal Information;

- Improper disclosure of their Personal Information;

- The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Personal Information being in the hands of criminals and having already been

misused;

- Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

- Ascertainable losses in the form of deprivation of the value of Personal Information, for which there is a well-established and quantifiable national and international market;

- The loss of use of and access to their credit, accounts, and/or funds;

- Damage to their credit due to fraudulent use of their Personal Information;

- The present value of ongoing credit monitoring and identity defense services necessitated by Snowflake's Data Breach; and

- Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

148.  Plaintiff and Class Members also now have a continued and increased risk to their Personal Information, which remains unencrypted and available for unauthorized third parties to access and abuse, and remains in Snowflake's possession, subject to future breaches or disclosures.

149.  As a direct and proximate result of Snowflake's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE
**(On Behalf of Plaintiff and the Classes against Ticketmaster)**

150.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

151.    Ticketmaster owed a duty of care to Plaintiff and Class Members to exercise reasonable care in obtaining, hosting, securing, safeguarding, and/or protecting the Personal Information Plaintiff and Class Members were required to provide to it, or otherwise provided to it.

152.    Ticketmaster was entrusted with, stored, and otherwise had access to the Personal Information of Plaintiff and Class Members.

153.    Ticketmaster was responsible for the storage and security of Plaintiff and Class Members Personal Information, regardless of whether it stored such information itself, or whether it utilized a third-party vendor to do so.

154.    Ticketmaster was responsible for adequately vetting the security practices of any third-party vendors it chose to utilize.

155.    Ticketmaster knew, or should have known, of the risks inherent to storing the Personal Information of Plaintiff and Class Members, and to not ensuring that its data hosting product was secure. These risks were reasonably foreseeable to Ticketmaster.

156.    A "special relationship" exists between Ticketmaster, on the one hand, and

Plaintiff and Class Members, on the other hand. Ticketmaster entered into a "special relationship" with Plaintiff and Class Members by agreeing to accept, store, and have access to sensitive Personal Information provided by Plaintiff and Class Members.

157.    Ticketmaster knew or should have known that its failure to utilize a data hosting vendor who had reasonable data security measures to protect and safeguard Plaintiff's and Class Members' Personal Information would cause damage to Plaintiff and the Class.

158.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Ticketmaster knew or should have known of the inherent risks in collecting and storing Personal Information and the critical importance of providing adequate security of that Personal Information.

159.    Plaintiff and the Class had no ability to protect their Personal Information that was in, and possibly remains in, Ticketmaster's possession.

160.    But for Ticketmaster's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

161.    Ticketmaster acted with wanton disregard for the security of Plaintiff's and Class Members' Personal Information.

162.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Ticketmaster's breach of its duties.

163.    Plaintiff and Class Members suffered more than just economic harm as a result of the Data Breach. Plaintiff and Class Members suffered loss of time, loss of

value of their Personal Information, and loss of privacy concerning their Personal Information.

164.   As a direct and proximate result of Ticketmaster's negligent conduct, Plaintiff and Class Members now face a certain increased risk of future harm. For them, the purpose for criminals to steal Personal Information is to sell it on the dark web for a profit to other criminals who purchase the information and use it to make fraudulent transactions or to support ransomware.

165.    As a direct and proximate result of Ticketmaster's negligence, Plaintiff and Class members have suffered injuries including:

- Trespass, damage to, and theft of their personal property, including Private Information;

- Invasion of privacy

- Misuse of their compromised Personal Information;

- Improper disclosure of their Personal Information;

- The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Personal Information being in the hands of criminals and having already been misused;

- Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

- Ascertainable losses in the form of deprivation of the value of Personal Information, for which there is a well-established and quantifiable national and international market;

- The loss of use of and access to their credit, accounts, and/or funds;

- Damage to their credit due to fraudulent use of their Personal Information;

- The present value of ongoing credit monitoring and identity defense services necessitated by Snowflake's Data Breach; and

- Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

166. Plaintiff and Class Members also now have a continued and increased risk to their Personal Information, which remains unencrypted and available for unauthorized third parties to access and abuse.

167. As a direct and proximate result of Ticketmaster's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### NEGLIGENCE PER SE
**(On Behalf of Plaintiff and the Classes against Snowflake)**

168. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

169.   Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Snowflake had a duty to provide adequate data security practices, to safeguard Plaintiff's and Class Members' Personal Information.

170.   Snowflake breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act (15 U.S.C. § 45), among other laws, including, but not limited to, by (1) failing to provide fair, reasonable, or adequate data security in connection with the sale and use of its data hosting/storage services; (2) failing to adequately monitor the security of its networks and systems; and (3) allowing unauthorized access to Plaintiff's and Class Members' Personal Information.

171.   Snowflake's violations of Section 5 of the FTC Act (and similar state statutes) constitute negligence *per se*.

172.   Plaintiff and Class Members are consumers within the class of persons that Section 5 of the FTC Act were intended to protect.

173.   The harm that has occurred is the type of harm the FTC Act were intended to guard against.

174.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Snowflake knew or should have known of the inherent risks in collecting and storing Personal Information, the critical importance of providing adequate security of that Personal Information, and the necessity for encrypting Personal Information stored on its systems.

175.   But for Snowflake's wrongful and negligent breach of its duties owed to Plaintiff and other Class Members, they would not have been injured.

176.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Snowflake's breach of its duties. Snowflake knew or should have known that it was failing to meet its duties, and that Snowflake's breach would cause Plaintiff and other Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

177.    As a direct and proximate result of Snowflake's negligent conduct, Plaintiff and other Class Members have suffered loss of time, loss of value of their Personal Information, and loss of privacy concerning their Personal Information, and now face an increased risk of future harm. As a direct and proximate result of Snowflake's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

178.   Finally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Personal Information, which remain in Snowflake's possession and is subject to further unauthorized disclosures so long as Snowflake fails to undertake appropriate and adequate measures to protect the Personal Information in its continued possession.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiff and the Classes against Ticketmaster)**

179.   Plaintiff realleges and incorporates all previous allegations as though

fully set forth herein.

180.   Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Ticketmaster had a duty to provide adequate data security practices, to safeguard Plaintiff's and Class Members' Personal Information.

181.   Ticketmaster breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act (15 U.S.C. § 45), among other laws, including, but not limited to, by (1) failing to provide fair, reasonable, or adequate data security to its customers; (2) failing to adequately vet its third party data storage vendors to ensure they maintained adequate data security practices; and (3) allowing unauthorized access to Plaintiff's and Class Members' Personal Information.

182.   Ticketmaster's violations of Section 5 of the FTC Act (and similar state statutes) constitute negligence *per se*.

183.   Plaintiff and Class Members are consumers within the class of persons that Section 5 of the FTC Act were intended to protect.

184.   The harm that has occurred is the type of harm the FTC Act were intended to guard against.

185.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Ticketmaster knew or should have known of the inherent risks in collecting and storing Personal Information and the critical importance of providing adequate security of that Personal Information.

186.   But for Ticketmaster's wrongful and negligent breach of its duties owed to Plaintiff and other Class Members, they would not have been injured.

187.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Ticketmaster's breach of its duties. Ticketmaster knew or should have known that a data breach of its data hosting vendor would cause Plaintiff and other Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

188.   As a direct and proximate result of Ticketmaster's negligent conduct, Plaintiff and other Class Members have suffered loss of time, loss of value of their Personal Information, and loss of privacy concerning their Personal Information, and now face an increased risk of future harm. As a direct and proximate result of Ticketmaster's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

189.   Finally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Personal Information, which remain in Ticketmaster's possession and is subject to further unauthorized disclosures so long as Ticketmaster fails to undertake appropriate and adequate measures to protect the Personal Information in its continued possession.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Classes Ticketmaster)

190.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

191.    When Plaintiff and Class Members provided their personal information to Ticketmaster, Plaintiff and Class Members entered into implied contracts with Ticketmaster pursuant to which Ticketmaster agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their data had been breached and compromised.

192.    Ticketmaster required Plaintiff and Class Members to provide and entrust their Personal Information and other private information as a necessary condition of purchasing their products or services and/or gaining employment.

193.    Plaintiff and Class Members would not have provided and entrusted their Personal Information and other private information to Ticketmaster in the absence of the implied contract between them and Ticketmaster.

194.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Ticketmaster.

195.    Ticketmaster breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect the personal information of Plaintiff and Class Members.

196.   As a direct and proximate result of Ticketmaster's breach of the implied contracts, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and the Classes Against Snowflake)**

197.   Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

198.   Upon information and belief, Snowflake entered into virtually identical data hosting and security services, which necessarily included data security practices, procedures, and protocols sufficient to safeguard the Personal Information that was to be entrusted to it.

199.   Such contracts were made expressly for the benefit of Plaintiff and the Class. It was Plaintiff's and the Class's Personal information and other private information that Snowflake agreed to receive and protect through its services. Thus, the benefit of collection, storage, and protection of the Personal Information belonging to Plaintiff and the Class was the direct and primary objective of the contracting parties, and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

200.   Snowflake knew that if it were to breach these contracts with its clients, including Ticketmaster, Plaintiff and the Class would be harmed.

201.   Snowflake breached its contracts with its clients and, as a result, Plaintiff and Class Members were affected by this Data Breach when Snowflake failed to use reasonable data security and/or business associate monitoring measures that could have prevented the Data Breach.

202.   As foreseen, Plaintiff and the Class were harmed by Snowflake's failure to use reasonable data security measures to securely store and protect the files in its care, including but not limited to, the continuous and substantial risk of harm through the loss of their Personal Information.

203.   Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code § 1798.100, et seq. ("CCPA")**
**(On Behalf of Plaintiff and the California Class Against Snowflake)**

204.   Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

205.   The CCPA was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent.

206.   Through the conduct complained of herein, Snowflake violated the CCPA by subjecting Plaintiff's and California Class Members' Personal Information to unauthorized access and exfiltration, theft, or disclosure as a result of Snowflake's violation of its duties to implement and maintain reasonable security procedures and

practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

207.   In accordance with Cal. Civ. Code §1798.150(b), on August 6, 2024, prior to the filing of this Complaint, Plaintiff's counsel served Snowflake with notice of their CCPA violations by certified mail, return receipt requested.

208.   Plaintiff currently seeks only injunctive relief in the form of an order enjoining Snowflake from continuing to violate the CCPA.

209.   If Snowflake fails to agree to rectify the violations detailed herein, Plaintiff will seek leave to amend this Complaint to seek actual, punitive, and statutory damages, restitution, and any other relief the Court deems proper as a result of Snowflake's CCPA violation.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code § 1798.100, et seq. ("CCPA")**
**(On Behalf of Plaintiff and the California Class Against Ticketmaster)**

210.   Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

211.   The CCPA was enacted to protect consumers' sensitive information from collection and use by businesses without appropriate notice and consent.

212.   Through the conduct complained of herein, Ticketmaster violated the CCPA by subjecting Plaintiff's and California Class Members' Personal Information to unauthorized access and exfiltration, theft, or disclosure as a result of Ticketmaster's

violation of its duties to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

213.   In accordance with Cal. Civ. Code §1798.150(b), on August 6, 2024, prior to the filing of this Complaint, Plaintiff's counsel served Ticketmaster with notice of their CCPA violations by certified mail, return receipt requested.

214.   Plaintiff currently seeks only injunctive relief in the form of an order enjoining Ticketmaster from continuing to violate the CCPA.

215.   If Ticketmaster fails to agree to rectify the violations detailed herein, Plaintiff will seek leave to amend this Complaint to seek actual, punitive, and statutory damages, restitution, and any other relief the Court deems proper as a result of Ticketmaster's CCPA violation.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACT
### Cal. Civ. Code §§ 1798.80, *et seq.* ("CCRA")
### (On Behalf of Plaintiff and the California Class Against Snowflake)

216.   Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

217.   "[T]o ensure that personal information about California residents is protected," the California legislature enacted Civil Code § 1798.81.5, which requires that any business that "owns or licenses personal information about a California resident shall implement and maintain reasonable security procedures and practices

appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

218.  By failing to implement reasonable measures to protect Plaintiff's and California Class Members' Personal Information, Snowflake violated Civil Code § 1798.81.5.

219.  In addition, by failing to promptly notify Plaintiff and all affected California Class Members that their Personal Information had been exposed, Snowflake violated Civil Code § 1798.82.

220.  As a direct or proximate result of Snowflake's violations of Civil Code §§ 1798.81.5 and 1798.82, Plaintiff and California Class Members were (and continue to be) injured and have suffered (and will continue to suffer) the damages and harms described herein.

221.  In addition, by violating Civil Code §§ 1798.81.5 and 1798.82, Snowflake "may be enjoined" under Civil Code Section 1798.84(e).

222.  Plaintiff seeks restitution, damages, injunctive relief, and all other relief available under this cause of action on behalf of the California Class.

## TENTH CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACT
### Cal. Civ. Code §§ 1798.80, *et seq.* ("CCRA")
### (On Behalf of Plaintiff and the California Class Against Ticketmaster)

223.  Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

224. "[T]o ensure that personal information about California residents is protected," the California legislature enacted Civil Code § 1798.81.5, which requires that any business that "owns or licenses personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

225. By failing to implement reasonable measures to protect Plaintiff's and California Class Members' Personal Information, Ticketmaster violated Civil Code § 1798.81.5.

226. In addition, by failing to promptly notify Plaintiff and all affected California Class Members that their Personal Information had been exposed, Ticketmaster violated Civil Code § 1798.82.

227. As a direct or proximate result of Ticketmaster's violations of Civil Code §§ 1798.81.5 and 1798.82, Plaintiff and California Class Members were (and continue to be) injured and have suffered (and will continue to suffer) the damages and harms described herein.

228. In addition, by violating Civil Code §§ 1798.81.5 and 1798.82, Ticketmaster "may be enjoined" under Civil Code Section 1798.84(e).

229. Plaintiff seeks restitution, damages, injunctive relief, and all other relief available under this cause of action on behalf of the California Class.

## ELEVENTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Classes Against Snowflake)

230.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

231.    Plaintiff and Class Members have an interest, both equitable and legal, in the Personal Information about them that was conveyed to, collected by, and maintained by Snowflake and that was ultimately accessed or compromised in the Data Breach.

232.    Snowflake's data hosting and storage services would not be necessary absent the need to provide cloud computing services to its customers, including to ensure the security of Plaintiff's and Class members' Personal Information. Plaintiff and Class Members provided a monetary benefit to Snowflake in the form of monies paid to Snowflake customers (including but not limited to Ticketmaster) for services.

233.    Plaintiff and Class Members had a reasonable expectation that their Personal Information would be secure when they provided their information to Snowflake's customers.

234.    Snowflake has knowingly obtained and derived benefits from Plaintiff and Class Members at Plaintiff's and Class Members' expense, namely the profits gained in exchange for the use of Snowflake's services, such that it would be inequitable and unjust for Defendant to retain them.

235.    A portion of the profit Snowflake obtained from Plaintiff and Class

Members, through its own customers, should have been reasonably expended to protect the Personal Information of Plaintiff and the Class.

236.    Snowflake's failure to do so constitutes the inequitable retention of a benefit without payment for its value.

237.    Snowflake knew or should that known that theft of consumer PII was a constant threat, yet it failed to take reasonable steps to ensure the level of security required to have prevent the theft of consumers Personal Information.

238.    Snowflake will be unjustly enriched if it is permitted to retain these benefits following the theft of Plaintiff's and Class Members' Personal Information.

239.    Snowflake's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class members' Personal Information, while at the same time failing to securely maintain that information from unauthorized access and compromise.

240.    Plaintiff and Class Members have no adequate remedy at law to recoup the money they paid to Snowflake's customers in conjunction with providing their Personal Information.

241.    As a direct and proximate result of Snowflake's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

242.    Snowflake should be compelled to disgorge into a common fund or

constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

**TWELFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Classes Against Ticketmaster)**

243.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

244.    Plaintiff and Class Members have an interest, both equitable and legal, in the Personal Information about them that was conveyed to, collected by, and maintained by Ticketmaster and that was ultimately accessed or compromised in the Data Breach.

245.    Plaintiff and Class Members provided a monetary benefit to Ticketmaster in the form of monies paid to it for services.

246.    Plaintiff and Class Members had a reasonable expectation that their Personal Information would be secure when they provided their information to Ticketmaster.

247.    Ticketmaster has knowingly obtained and derived benefits from Plaintiff and Class Members at Plaintiff's and Class Members' expense, namely the profits gained in exchange for its products and/or services, such that it would be inequitable and unjust for Ticketmaster to retain them.

248.    A portion of the profit Ticketmaster obtained from Plaintiff and Class Members, should have been reasonably expended to protect the Personal

Information of Plaintiff and the Class.

249.    Ticketmaster's failure to do so constitutes the inequitable retention of a benefit without payment for its value.

250.    Ticketmaster knew or should that known that theft of consumer PII was a constant threat, yet it failed to take reasonable steps to ensure the level of security required to have prevent the theft of consumers Personal Information, including, but not limited to, utilizing a third-party data hosting vendor who maintained adequate security practices.

251.    Ticketmaster will be unjustly enriched if it is permitted to retain these benefits following the theft of Plaintiff's and Class Members' Personal Information.

252.    Ticketmaster's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the collection, maintenance, and inadequate security of Plaintiff's and Class members' Personal Information, while at the same time failing to securely maintain that information from unauthorized access and compromise.

253.    Plaintiff and Class Members have no adequate remedy at law to recoup the money they paid to Ticketmaster in conjunction with providing their Personal Information.

254.    As a direct and proximate result of Ticketmaster's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

255.    Ticketmaster should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

## THIRTEENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT/INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the Classes Against Snowflake)

256.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

257.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

258.    Snowflake owes a duty of care to Plaintiff and class members that require it to adequately secure Plaintiff's and class members' Personal Information.

259.    Snowflake still possesses the Personal Information of Plaintiff and the class members.

260.    Snowflake has not satisfied its contractual obligations and legal duties to Plaintiff and the class members.

261.    An actual controversy has arisen and exists between Plaintiff and Class Members, on the one hand, and Snowflake, on the other hand, concerning the Data Breach and Snowflake's failure to protect Plaintiff's and Class Members' Personal

Information, including with respect to the issue of whether Snowflake took adequate measures to protect that information. Plaintiff and Class Members are entitled to judicial determination as to whether Defendant has performed and is adhering to all data privacy obligations as required by law or otherwise to protect Plaintiff's and Class Members' Personal Information from unauthorized access, disclosure, and use.

262.  Plaintiff and Class Members, therefore, seek a declaration (1) that Snowflake's existing data security measures do not comply with its contractual obligations and duties of care to provide adequate data security, and (2) that to comply with its contractual obligations and duties of care, Snowflake must implement and maintain reasonable security measures, including, but not limited to, the following:

a.  Ordering that Snowflake maintains rigorous hiring practices and training for all employees who have access to Private Information.

b.  Ordering that Snowflake engages internal security personnel to conduct testing, including audits on its systems, on a periodic basis, and ordering Snowflake to promptly correct any problems or issues detected by such third-party security auditors.

c.  Ordering that Snowflake engages third-party security auditors and internal personnel to run automated security monitoring.

d.  Ordering that Snowflake audits, tests, and trains its security personnel and employees regarding any new or modified data security policies and procedures.

e.  Ordering that Snowflake conducts regular database scanning and security checks; and

f.  Ordering that Snowflake routinely and continually conducts internal training and education to inform internal security personnel and employees how to safely share and maintain Personal Information.

## FOURTEENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT/INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the Classes Against Ticketmaster)

263.    Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

264.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

265.  Ticketmaster owes a duty of care to Plaintiff and class members that require it to adequately secure Plaintiff's and class members' Personal Information.

266.  Ticketmaster still possesses the Personal Information of Plaintiff and the class members.

267.  Ticketmaster has not satisfied its contractual obligations and legal duties to Plaintiff and the class members.

268.  An actual controversy has arisen and exists between Plaintiff and Class

Members, on the one hand, and Ticketmaster, on the other hand, concerning the Data Breach and Ticketmaster's failure to protect Plaintiff's and Class Members' Personal Information, including with respect to the issue of whether Ticketmaster took adequate measures to protect that information. Plaintiff and Class Members are entitled to judicial determination as to whether Ticketmaster has performed and is adhering to all data privacy obligations as required by law or otherwise to protect Plaintiff's and Class Members' Personal Information from unauthorized access, disclosure, and use.

269.  Plaintiff and Class Members, therefore, seek a declaration (1) that Ticketmaster's existing data security measures do not comply with its contractual obligations and duties of care to provide adequate data security, and (2) that to comply with its contractual obligations and duties of care, Ticketmaster must implement and maintain reasonable security measures, including, but not limited to, the following:

a.  Ordering that Ticketmaster adequately vet any of its vendors who have access to its customers and/or employees' Personal Information.

b.  Ordering that Ticketmaster engages internal security personnel to conduct testing, including audits on any of its own systems that contain Personal Information, on a periodic basis, and ordering Ticketmaster to promptly correct any problems or issues detected by such third-party security auditors.

c.  Ordering that Ticketmaster immediately delete or otherwise destroy, in a secure manner, all Personal Information for its customers and/or employees that it does not require for the ordinary course of business.

d.  Ordering that Ticketmaster routinely and continually conducts internal training and education to inform internal security personnel and employees how to safely share and maintain Personal Information.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23 and appoint Plaintiff as class representative and undersigned counsel as class counsel.

B.    Award Plaintiff and Class Members actual and statutory damages, punitive damages, and monetary damages to the maximum extent allowable.

C.    Award declaratory and injunctive relief as permitted by law or equity to assure that Class Member have an effective remedy, including enjoining Snowflake and Ticketmaster from continuing the unlawful practices as set forth above.

D.    Award Plaintiff and Class Members pre-judgment and post-judgment interest to the maximum extent allowable.

E.    Award Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Award Plaintiff and Class Members such other favorable relief as

allowable under law or at equity.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury on all issues so

triable. Date this <u>26</u><sup>th</sup> day of September 2024.


Respectfully Submitted,

<u>/s/ John Heenan</u>
John Heenan
john@lawmontana.com
Joseph Cook
joe@lawmontana.com
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, MT 59102
Phone: (406) 839-9091

William Caldes (*pro hac vice forthcoming*)
Jeffrey Spector (*pro hac vice forthcoming*)
Diana J. Zinser (*pro hac vice forthcoming*)
**SPECTOR ROSEMAN & KODROFF, P.C.** (*pro hac vice forthcoming*)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Phone: (215) 496-0300
bcaldes@srkattorneys.com
jspector@srkattorneys.com
dzinser@srkattorneys.com

*Attorneys for Plaintiff and the Proposed Class*